# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1164V

|  |  |
|---|---|
| ALBAN COOPER,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br><br>Filed: May 11, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC, for Respondent.*

### <u>RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES</u>[1]

On April 7, 2021, Alban Cooper filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine he received on October 9, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). The parties were unable to resolve entitlement or damages, so both were submitted for an SPU "Motions Day" hearing, held on April 24, 2026.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below (and as orally stated at the Motions Day hearing), **I find that Petitioner is entitled to compensation, and I award damages in the total amount of $75,586.00 (comprised of $75,000.00 for pain and suffering, plus $586.00 for past unreimbursed expenses).**

## I.     Relevant Procedural History

The parties engaged in settlement negotiations before reaching an impasse in August 2024. *See* ECF No. 38. Respondent subsequently filed his Rule 4(c) Report on September 27, 2024, contending that Petitioner had not provided preponderant evidence that the onset of his pain occurred within 48 hours of vaccination. ECF No. 39. I directed the parties to brief both the disputed entitlement issues and damages. Petitioner filed his Motion for Ruling on the Record Regarding Entitlement and Damages on December 4, 2024. ECF No. 41. Respondent filed a response on February 14, 2025, and Petitioner filed a reply on March 17, 2025. ECF No. 43-44.

On March 26, 2026, I proposed that the case be submitted for an expedited hearing on April 24, 2026, at which time I would decide the disputed issues. ECF No. 45. During the hearing, I orally ruled on Petitioner's entitlement to compensation, and then made an oral damages determination. This Decision memorializes those findings and determinations.

## II.     Relevant Facts

Petitioner received a flu vaccine in his left arm on October 9, 2020. Ex. 1 at 3. At the time, he was 43 years old and employed as a senior museum exhibition designer.

Forty-three days after his vaccination, on November 24, 2020, Petitioner had a Teladoc appointment. Ex. 19 at 3. The record says only "Patient has associated shoulder pain." *Id*. He was given a referral "for consideration of trigger point injection." *Id*. at 4. Later that same day, Petitioner called his primary care provider's ("PCP") office. Ex. 18 at 1. He reported he was "still having pain" after a vaccination. *Id*. He explained that he'd had a Teladoc visit and asked about "some kind of injection." *Id*. The person who took his call stated that the treater has stated that they did not know what kind of injection had been delivered. *Id*. Petitioner was advised to go to urgent care (as the office was closed through 11/30/2020). *Id*.

Petitioner saw a new PCP on January 18, 2021 (now three months post-vaccination). Ex. 2 at 9. He reported "left shoulder pain for 3 months" noting that he "had

2

[a] flu vaccine back in October, since then his left shoulder hurts." *Id*. He was referred to an orthopedist. *Id*. at 11.

Petitioner saw an orthopedist on January 22, 2021. Ex. 4 at 13. He reported left shoulder pain that began the day after getting a flu vaccine – approximately three months prior – but had become severe in the last couple of weeks. *Id*. He reported his pain level as 5/10. *Id*. X-rays were normal. *Id*. at 14. The differential diagnoses were frozen shoulder vs. tendonitis/bursitis. *Id*. Petitioner received a cortisone injection, instructions to use ibuprofen, and a referral for physical therapy. *Id*.

Petitioner had a virtual visit with his PCP on February 8, 2021, and reported that his shoulder pain and stiffness were "not better" after his steroid injection. Ex. 2 at 4. He was encouraged to consult his orthopedist. *Id*. at 8. He called the orthopedist the following day and reported that his "shoulder pain continued to be fairly severe" after the steroid injection "did not help." Ex. 4 at 10. He was sent for an MRI, which showed a small GH joint effusion and other findings suggestive of adhesive capsulitis. *Id*.; Ex. 5 at 8-9.

Petitioner returned to the orthopedist on March 5, 2021, to review the MRI. Ex. 4 at 10. He reported that his range of motion had worsened, although his pain had improved slightly to 3/10. *Id*. He was prescribed Celebrex for pain and referred again to physical therapy. *Id*. at 11.

Petitioner began physical therapy on May 3, 2021. Ex. 6 at 53. The record says "had a flu shot in 2019. Soon after shlder [sic] started to hurt and progress to being stiff as well. Not able to do anything in 2020 d/t covid." *Id*. On exam, Petitioner's left shoulder range of motion was significantly limited (115 degrees flexion, 75 degrees abduction, 20 degrees of ER, 45 degrees of IR). *Id*. He completed 15 physical therapy treatments through August 31, 2021. *Id*. at 185. At the time of discharge, he reported only a few episodes of pain, but "mostly hasn't thought about his shoulder in 1.5-2 weeks." *Id*. His range of motion was nearly full and he had no pain unless he pushed it. *Id*. He was independent with all daily home and work activities. *Id*. Petitioner was advised to continue his home exercise plan 4-5 times per week for about two months, and then decrease the frequency to three times per week as maintenance. *Id*.

Petitioner returned to his PCP more than *two years later*, on September 25, 2023, stating that he "continues to have left shoulder pain." Ex. 10 at 1. He was referred back to his orthopedist and to physical therapy. *Id*. at 2. He saw a new orthopedist on October 12, 2023. Ex. 11 at 1. The doctor noted that Petitioner had "previously seen Dr. Northrup for the same concern." *Id*. Petitioner reported improvement from his previous treatment, but said that he "never truly got back to 100% and it had been bothering him significantly

3

since then." *Id*. at 3. He noted that he had had worsening pain for the previous two months. *Id.* On exam, he had decreased range of motion at the end ranges and pain that he rated 2/10. *Id*. Petitioner received a second cortisone injection and was referred back to physical therapy. *Id*.

Petitioner returned to physical therapy on December 5, 2023. Ex. 12 at 1. He reported left shoulder pain that initially began in October 2020 from a vaccination. *Id*. He explained that he had an injection and "did ok but did not return [to] 100%." *Id*. He also said he had done physical therapy, which was painful, but that "he stopped because he felt it was getting to 100% better." *Id*. He also reported that the second cortisone injection "helped a little." *Id.* His pain at the time was 3/10 at rest and 6/10 with activity. *Id*. His range of motion was initially reduced, but improved significantly with treatment. *Id*. Petitioner attended two additional sessions on December 12 and December 18, before a three month gap. *Id*. at 2-3. He returned for another evaluation on March 12, 2024, when he reported pain of 3/10 at rest and 5/10 with activity. Ex. 12 at 8. He attended six additional sessions through May 10, 2024. *Id*. at 12-15; Ex. 14 at 1-8. At his last treatment, he reported being able to participate in all activities with some residual tightness. Ex. 14. at 1.

Petitioner returned to the orthopedist on April 3, 2024. Ex. 13 at 1. He reported mild improvement in motion, but worsening pain. *Id*. A second MRI was ordered, but not completed. See *id*. at 3.

Petitioner did not seek further treatment for her left shoulder pain.

<u>Affidavit Testimony</u>

Petitioner filed two affidavits in support of his claim. Ex. 9, 16. He recalled that he was told to sit in a chair while the administrator stood and "inserted the syringe into [his] shoulder at what even at the time seemed like an odd angle." Ex. 16 at ¶1. He stated that he "could distinctly feel the vaccine liquid enter his shoulder." Ex. 9 at ¶1. Petitioner recalled that "a throbbing started after the injection" and continued that evening. Ex. 16 at ¶2. When he woke the next morning, his "mobility was severely reduced and any movement outside of a small range would cause an extreme pain." *Id*.

Petitioner noted that even though he was in extreme pain, he delayed seeking treatment due to the Covid-19 Pandemic. Ex. 16 at ¶4-6. During that period, he was working from home and "could rest [his] arm as needed." *Id*. at ¶6. He said "the pain was bad, but contracting a fatal or long term case of covid seemed more dire." *Id*.

4

Petitioner described losing sleep "both from the intense pain and the anxiety." Ex. 9 at ¶2. He was unable to make coffee, grocery shop, or drive. *Id*. He could not shower without aid. *Id*. He described physical therapy as "incredibly painful treatment" for four months. Ex. 16 at ¶9. He says he fears his ongoing symptoms will remain permanently. *Id*. at ¶10.

Petitioner's partner, Sarah Wilson, also filed an affidavit. Ex. 17. She received a flu vaccine at the same time as Mr. Cooper, but only experienced typical soreness. *Id*. at ¶2. She recalled Petitioner complaining of severe pain by the day after the vaccine, which continued to worsen. *Id*. She recalled that he modified his posture while sitting and his position while sleeping to minimize pain, and observed him unable to lift his arm above his head. *Id*. She said that "by January 2021, the unrelenting pain had become too much and Petitioner decided he could not delay seeking medical consultation." *Id*. at ¶4. She described his physical therapy as "incredibly painful," but noted that it provided some pain relief and helped him to rebuild some flexibility and strength in his arm. *Id*.

## III.    Legal Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## I.     Prior SIRVA Compensation Within SPU[3]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[4] In only 270 of these cases, however, was the amount

---

[3] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[4] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

of damages determined by a special master in a reasoned decision.[5] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| Total Cases | 270 | 2,206 | 30 | 1,891 |
| Lowest | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| 1st Quartile | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| Median | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| 3rd Quartile | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were determined in a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

[5] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

250.00 to $1,500.00.[8] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[9]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[9] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

### IV.    Findings of Fact and Ruling on Entitlement

### I.    Onset

Respondent argues that Petitioner has not provided preponderant evidence that his pain began within 48 hours after his vaccination. Resp. at 7. He notes that "the medical records reflect that Petitioner began experiencing shoulder pain as early as January 2019 – one year and nine months before" his vaccination. *Id*. In support, he relies on physical therapy records beginning on May 3, 2021. *Id.* Respondent also argues that Petitioner waited over six weeks to seek treatment, and then an additional seven weeks before returning for a second visit after the first yielded no treatment. Resp. at 8.

There is, however, support in the record for the conclusion that Petitioner experienced pain within 48 hours of his vaccination. The first day he sought treatment, he reported that he was "still having pain" after his vaccination. Ex. 18 at 1. At his second appointment, on January 18, 2021 (three months and nine days after vaccination), Petitioner reported that he experienced three months of left shoulder pain "since" his "flu vaccine back in October." Ex. 2 at 9. And at his first appointment with an orthopedist, Petitioner reported left shoulder pain that "began the day after getting a flu shot – approximately three months ago." Ex. 4 at 13.

Petitioner's affidavit also supports Table onset and does not contradict the medical records. He recalled that "a throbbing started after the injection" and continued that evening. Ex. 16 at ¶2. When he woke the next morning, his "mobility was severely reduced and any movement outside of a small range would cause an extreme pain." *Id*. Further, all three medical records were within the first three months after Petitioner's vaccination and significantly predate the records cited by Respondent, (which, notably, also relate the onset of his shoulder pain to a vaccination). In contrast, the records cited by Respondent, which suggest onset beginning in 2019, are from one provider, Petitioner's physical therapist, and are isolated references at best. And there is no other evidence of a 2019 vaccination, or of an earlier onset in the record. *See* Ex. 6.

Respondent also highlights Petitioner's delay in seeking treatment – approximately six weeks until a virtual medical visit that did not lead to any treatment – and then seven more weeks until an in-person appointment with his PCP. Resp. at 8. But delay in this case was not particularly long, and Petitioner has provided a reasonable explanation for his reluctance to seek care (lingering concern for the Pandemic's dangers). Ex. 16 at ¶4-6. As soon as Petitioner felt that his symptoms were not going to improve and it was safer to seek in-person treatment, he did so. Mot. at 9; *See also* Ex. 17 at ¶4. There is no evidence that Petitioner sought treatment for other conditions during this period.

Accordingly, there is preponderant evidence to establish that the onset of Petitioner's pain occurred within 48 hours of his October 9, 2020 vaccination.

## II.    Other Requirements for Entitlement

Other than the argument regarding onset, Respondent has not contested Petitioner's proof on the remaining elements of a Table SIVRA. In light of Respondent's position and the record evidence, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury. However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received a flu vaccine on October 9, 2020. Ex. 1 at 3; Section 11(c)(1)(A) (requiring receipt of a covered vaccine). Additionally, Petitioner has stated that he has not filed any civil action or received any compensation for his vaccine-related injury, and there is no evidence to the contrary. *See* Ex. 9 at ¶6; Section 11(c)(1)(E) (lack of prior civil award). Finally, Petitioner's medical records reveal that he suffered the residual effects of his vaccine injury for more than six months, and Respondent does not argue otherwise. *See e.g.*, Ex. 6; Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## V.    Compensation to be Awarded

### I.    Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record and all assertions made by the parties during oral argument. I also consider prior awards for pain and suffering in SIRVA cases and rely upon my experience adjudicating these cases. However, my determination is based on the specific circumstances of this case.

There is no dispute about Petitioner's awareness through his injury and treatment course. My analysis thus focuses upon the duration and severity of his injury. The records reflect that Petitioner suffered a moderate SIRVA injury that did not require surgical intervention. Petitioner had a virtual consultation with a doctor six weeks after his vaccination and sought in-person treatment within three months. Ex. 2 at 9; Ex. 18 at 1; Ex. 19 at 3. During the initial phase of treatment, he saw an orthopedist, had an x-ray and an MRI, received one cortisone injection, and completed 15 physical therapy treatments. Ex. 4 at 10-13; Ex. 5 at 8-9; Ex. 6 at 185. He described his pain as "extreme" and "intense"

12

in his affidavit, and reported pain between 3/10 and 5/10 during treatment. *See* Ex. 4 at 13; Ex. 6 at 53; Ex. 9 at ¶2; Ex. 16 at ¶4-6. After a two-year hiatus from treatment, Petitioner returned to treatment, received a second cortisone injection, and completed 10 additional physical therapy treatments. Ex. 10 at 1; Ex. 11 at 1-3; Ex. 12; Ex. 14.

Both parties citied prior SIRVA cases in support of their proposed pain and suffering awards. Respondent cited one case, *McGraw v. Secretary of Health and Human Services*, 21-0072V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024), in which the claimant was awarded $37,500.00 in pain and suffering for a SIRVA that just barely satisfied the six-month severity requirement. Resp. at 19. However, that case is factually distinguishable from the instant case, suggesting a somewhat higher award is justified.

Petitioner cited two cases with pain and suffering awards of $110,000.00 to support his proposed award. Mot. at 19-21. But, those cases are also distinguishable in significant ways. The claimant in *Danielson v. Secretary of Health and Human Services*, No. 18-1878V, 2020 WL 8271642, at *5 (Fed. Cl. Spec. Mstr. Dec. 29, 2020), for example, suffered a permanent injury and was awarded damages for future pain and suffering in addition to actual pain and suffering. Similarly, the claimant in *Cooper v. Secretary of Health and Human Services*, No. 16-1387V, 2018 WL 6288181, at *9 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) provided evidence of significant personal and professional impacts from her injury, including an inability to continue working at her job and having to change her retirement plans. Further, neither suspended treatment for as long as Petitioner, who had a treatment gap of more than *two years* – a factor to which I give great weight in the determination of pain and suffering.

I find *Starnes v. Sec'y of Health of Human Servs.*, No. 20-1514V, 2023 WL 8110730 (Fed. Cl. Spec. Mstr. Oct. 13, 2023) to be more helpful here. That claimant was awarded $78,000.00 in pain and suffering after seeking treatment within one week and reporting high levels of pain during the first month after vaccination. *Id*. at *5. She was prescribed oral medications, received one cortisone injection, and attended 16 physical therapy sessions. *Id.* Her treatment spanned 34 months in total, with gaps of about 16 months, which reduced the amount of her award. *Id*. Although Mr. Cooper had one additional cortisone injection and more physical therapy treatment, he delayed initial treatment longer and had a longer hiatus after obtaining some treatment, suggesting that a similar award is appropriate in this case.

Thus, and as explained during my oral ruling on April 24, 2026 (which is fully adopted herein), **I find that $75,000.00 represents a fair and appropriate amount of compensation for Petitioner's pain and suffering.**

13

**II.    Actual Unreimbursed Expenses**

Petitioner requests **$586.00 in past unreimbursed out-of-pocket expenses**. Mot. at 21. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 19.

**Conclusion**

For all the reasons discussed above and based on consideration of the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case.

Furthermore, I award Petitioner a lump sum payment of **$75,586.00 (representing $75,000.00 for pain and suffering, plus $586.00 for past unreimbursed expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**                                  **s/Brian H. Corcoran**
                                                        Brian H. Corcoran
                                                        Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.